# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michelle Le, Jane Geiger, Lindsay Kallenbach,      Civil No. 13-391 (DWF/SER)
Rachel Thunstrom, and Jamie Widmer,
individually and on behalf of all other similarly
situated individuals, and the Proposed
Minnesota Rule 23 Class; and Timothy D.
Moratzka, as Trustee for the Bankruptcy
Estate of Michelle Le, Bankruptcy
#11-46944-RJK,

         Plaintiffs,

v.                                     **MEMORANDUM**
                                           **OPINION AND ORDER**

Regency Corporation d/b/a
Regency Beauty Institute; and
J. Hayes Batson,

         Defendants.

_____

J. Ashwin Madia, Esq., Madia Law LLC, counsel for Plaintiffs.

Andrew J. Voss, Esq., and Jeffrey A. Timmerman, Esq., Littler Mendelson, PC counsel
for Defendants.
_____


## INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Class Certification, Court

Authorized Notice, and Tolling of Statute of Limitations (Doc. No. 14) and Defendants'

Motion for Partial Dismissal of Plaintiffs' Class and Collective First Amended Complaint

(Doc. No. 44).  For the reasons set forth below, the Court grants in part and denies in part the motions.

## BACKGROUND

Defendant Regency Corporation d/b/a Regency Beauty Institute ("Regency") is a domestic corporation that provides cosmetology education to students.  (Doc. No. 36, Am. Compl. ¶ 8.)  At all relevant times, Defendant J. Hayes Batson ("Batson") was the sole owner, Chief Executive Officer, and Chairman of Regency.[1]  (*Id.* ¶¶ 9, 67.)  Regency operates in approximately twenty states and has eighty-nine campuses across the country with its headquarters in Saint Louis Park, Minnesota.  (*Id.* ¶ 8.)  Regency employs 864 people across the United States.  (Doc. No. 31, Carlson Decl. ¶ 2.)  Currently, 196 employees are based out of Regency's headquarters in Saint Louis Park, including the Admissions Department.  (*Id.* ¶ 3.)  Since February 18, 2010, Regency has employed approximately 155 Representatives.  (*Id.*)

Plaintiffs were all at one time either Admissions Representatives or Admissions Agreement Representatives (together, "Representatives") employed by Regency.  (Am. Compl. ¶¶ 3-7, 10.)  Admissions Representatives place telephone calls to prospective

---

[1]    Plaintiffs assert that Batson exercised operational control and active supervision over Regency Representatives and their working conditions.  (Am. Compl. ¶¶ 67-70.)  In particular, Plaintiffs assert that Batson:  regularly met with Regency executives and Regency's Vice President of Admissions, Roxanne Chihos (who supervised Plaintiffs and other Representatives); led monthly company-wide meetings; lobbied lawmakers on behalf of Regency; dined with employees; observed employee offices; spoke at weekend Summits, which Regency required Representatives to attend; and questioned Representatives about their recruitment numbers.  (*Id.* ¶¶ 68-69.)

students to try to recruit them for enrollment at Regency. (*Id.* ¶ 14.) Admissions Agreement Representatives work to ensure enrolled students are prepared to start class, take incoming calls from prospective students, meet with financial aid advisors, and track documents for incoming students. (*Id.* ¶ 16.) All Representatives are subject to constant and direct supervision. (*Id.* ¶¶ 15, 17.)

Plaintiffs allege that through December 2010, Defendants paid Plaintiffs and other similarly situated individuals on a salary basis to avoid compensating them for overtime. (*Id.* ¶ 20.) In November 2010, Stacey Cunningham, Regency's Vice President of Human Resources, held a mandatory meeting for employees during which she informed Plaintiffs and other similarly situated individuals that Regency would require Plaintiffs and other "hourly employees" to start utilizing a time clock system. (*Id.* ¶ 21.) According to Plaintiffs, when they inquired about their status as salaried employees, Plaintiffs were told that they had always been hourly employees. (*Id.*)

Defendants claim that Representatives have been treated as overtime eligible since February 2010 and that until December 2010, "Representatives were compensated based on their scheduled work hours and off-schedule overtime hours they reported to Regency." (Carlson Decl. ¶ 4.) Defendants acknowledge that on December 20, 2010, Representatives began reporting their work time using Regency's biometric time clocks. (*Id.* ¶ 5.)

## I.       Plaintiffs' Allegations

The allegations of each of the named Plaintiffs with respect to their employment at Regency are summarized below.

### A.       Plaintiff Michelle Le

Le worked as both an Admissions Representative and Admissions Agreement Representative for Regency from April 2007 through August 2011.  (Doc. No. 17 ("Madia Aff. I") ¶ 2, Ex. 1 ¶ 1.)  Through December 2010, Le worked 45 to 55 hours per week and approximately 60 hours per week during the busy seasons, which were January through March and July through October.  (Am. Compl. ¶ 22; Madia Aff. I ¶ 2, Ex. 1 ¶ 12.)  Le went on maternity leave in September 2010.  (Madia Aff. I ¶ 2, Ex. 1 ¶ 10.)  To Le's knowledge, Regency did not use a time clock or any other hours tracking system at any time during her employment prior to maternity leave.  (*Id*.)  Le was paid an annual salary until her return from maternity leave, when she was informed that she was an hourly employee and would have to clock in and out.  (*Id*. ¶¶ 11, 14.)  As a salaried employee, Le was encouraged to and often came in early, worked nights, weekends, and from home to meet admissions goals.  (*Id*. ¶¶ 11, 13.)  Le felt "strongly pressured to meet daily, weekly and monthly admissions goals to enroll more and more students."  (*Id*. ¶ 13.)  Le asserts that Regency knew that she was working uncompensated overtime because her supervisors "saw me, encouraged me, and sometimes required me to do so."  (*Id*. ¶ 13.)  Le was also given a home log-in portal so that she could work remotely from home.  (*Id*. ¶ 12.)

Upon returning from maternity leave and learning that she was an hourly employee, Le asked her supervisor JoDee Hunter: "What about all the money that I was never paid for all the overtime I worked for the last three or four years?" (*Id.* ¶ 14.) Hunter told Le: "You don't want to go down that road. You don't want to burn bridges." (*Id.*) Le received the same response from "multiple other supervisors." (*Id.*)

Once the time clock system was implemented, Le worked approximately one to two hours "off the clock" at the end of each scheduled shift, beyond the 40-hour week for which she was scheduled. (*Id.* ¶ 17.) Supervisors sent Le to campuses to meet with prospective students and provide tours as well as to high schools and trade schools to recruit students. (*Id.* ¶¶ 17-18.) Hunter allegedly told Le to clock out prior to her campus visits, and Le was not paid for any of the time spent on these visits. (*Id.*)

Le and her husband filed for bankruptcy in October 2011. (Doc. No. 38 ("Madia Aff. II") ¶ 2, Ex. 1 ¶ 8.) Le did not list her claims against Regency as an asset. (*Id.* ¶¶ 7-8.) The bankruptcy Trustee has since been added as a plaintiff in this action, pursuant to a stipulation of the parties. (Doc. Nos. 47 & 51-52.)

## B. Plaintiff Rachel Thunstrom

Thunstrom worked as an Admissions Representative and Admissions Agreement Representative for Regency from April 2009 through September 2011. (Madia Aff. I ¶ 2, Ex. 4 ¶ 1.) Thunstrom worked approximately 50 to 55 hours per week, and 60 hours per week during the busy seasons, through December 2010. (*Id.* ¶10; Am. Compl. ¶ 28.) From April 2009 through December 2010, Regency paid Thunstrom on a salary basis.

(Am. Compl. ¶ 29.)  At the November 2010 staff meeting, Thunstrom, along with the other Plaintiffs and similarly situated individuals, was informed that she was and had always been an hourly employee.  (Madia Aff. I ¶ 2, Ex. 4 ¶ 17.)

After the implementation of the time clock system, Thunstrom claims that her supervisors regularly required her to clock out at the end of her shift and then return to her desk to make more phone calls to reach sales goals.  (*Id.* ¶ 18.)  She was typically scheduled for 40 hours per week and the time spent over 40 hours was uncompensated. (*Id.*)  Thunstrom's supervisors would sometimes call her on the telephone on her way home after her shift to ask her questions and instruct her on tasks that still needed to be accomplished.  (*Id.* ¶ 22.)  This time was also uncompensated.  (*Id.*)

Further, Defendants expected and encouraged Thunstrom to arrive early, leave late, work weekends, miss breaks, and attend uncompensated weekend "Summits."  (Am. Compl. ¶¶ 30-32.)  During the busy seasons, Regency brought carts to the Representatives' desks at lunch so that they could eat without taking a break.  (*Id.* ¶ 29.) Thunstrom was also questioned about taking two-minute restroom breaks during busy season as she was not making calls at that time.  (*Id.* ¶ 33.)

Chihos encouraged Thunstrom and similarly situated individuals to work weekends.  (*Id.* ¶ 32.)  When Thunstrom explained that she had to go to church, Chihos told her to come in after church.  (*Id.*)  Defendants also encouraged Thunstrom and others to enroll students over the weekend by asking, "How many phone enrollments can you get over the weekend for the start of Monday?"  (*Id.*)

### C.     Plaintiff Jamie Widmer

Widmer was an Admissions Representative and Admissions Agreement Representative for Regency from February 2007 through September 2012.  (Madia Aff. I ¶ 2, Ex. 5 ¶ 1.)  Widmer worked approximately 50 to 55 hours per week for Regency and more than 60 hours per week during the busy seasons.  (Am. Compl. ¶ 35.)  Widmer was similarly told after having been a salaried employee that she had always been an hourly employee.  (*Id*.)  Widmer told Cunningham that she had not been paid for her overtime hours and was instructed to speak to her supervisor after the meeting.  (*Id*. ¶ 36.)  Widmer spoke to her supervisor, Hunter, who told her:  "If you want to maintain a job here, then you don't want to go down that road."  (*Id*. ¶ 37.)  Widmer spoke to other supervisors and each told her, "You don't want to go down that road."  (*Id*.)

Widmer also experienced the same kind of encouragement to work on weekends outside of her scheduled shifts and to work through rest and meal breaks.  (*Id*. ¶ 38; Madia Aff. I ¶ 2, Ex. 5 ¶ 11.)  Widmer, too, was instructed by Chihos to come in on weekends after church and to find a babysitter to do so, because "you're salaried—you'll find a way to get it done.  You'll do what it takes."  (Madia Aff. I ¶ 2, Ex. 5 ¶ 11.)  She, too, was encouraged to see "How many phone enrollments can you get over the weekend for the start of Monday?" (*Id*.; Am. Compl. ¶ 38.)

Following the implementation of the time clock, Widmer was routinely required by instructors to perform uncompensated work off the clock.  (Madia Aff. I ¶ 2, Ex. 5 ¶ 16.)  Widmer spent approximately three hours per week to one to two hours per day

working off the clock.  (*Id.* ¶ 16.)  She was encouraged to get to work 45 minutes early to complete reports regarding the previous days' calls and respond to e-mails, and was not permitted to clock in at that time.  (*Id.* ¶ 17.)  Widmer's supervisor observed her working, responded to her e-mails, and asked her questions during this off the clock time.  (*Id.*)  Widmer would then get up from her desk, clock in, and turn in her completed reports to her supervisor.  (*Id.*)  Her supervisor, however, would make comments like:  "Well, I don't know what you're doing."  (*Id.*)  Widmer was encouraged, and sometimes required, to clock out and return to her desk if her work was not completed at the end of her shift, and was told by supervisors when she informed them that she occasionally had to work off the clock from home or on weekends, that they "[didn't] want to hear about it."  (*Id.* ¶ 19.)  Additionally, Defendants required Widmer to travel to Texas for work and did not compensate her for travel time.  (Am. Compl. ¶ 39.)  When she returned from Texas, Chihos told her to create a report regarding her trip, but to do so off the clock.  (*Id.*)

### D.     Plaintiff Jane Geiger

Geiger worked as an Admissions Representative and Admissions Agreement Representative for Regency from October 2007 through September 2012.  (Madia Aff. I ¶ 2, Ex. 2 ¶ 1.)  Geiger worked 50 to 60 hours per week for Regency, arriving an hour or an hour and a half early for her shifts and leaving work between 6:00 p.m. and 7:30 p.m.  (Am. Compl. ¶ 40.)  She often worked for another two hours, at least three days per week, from home through remote access (internet log-in).  (*Id.*)  From October 2007 through December 2010, Geiger was paid on a salary basis.  (*Id.* ¶ 42.)

Just like the other Plaintiffs, Geiger was informed at the previously mentioned staff meeting that she was and had always been an hourly employee.  (Madia Aff. I ¶ 2, Ex. 2 ¶ 14.)  Geiger set a meeting with Human Resources Representative Ranae Hendrickson to discuss overtime pay after the staff meeting.  (*Id*. ¶ 15.)  Ms. Hendrickson told Geiger, "It all comes out in the wash.  You probably left early when it wasn't busy, and maybe you stayed later on some days."  (*Id*.)  Geiger refuted this statement and spoke to her supervisor, Kris Kelbrants, who responded, "It's for your benefit—you want a better work/life balance don't you?"  (*Id*.)

After the implementation of the time clock system, employees were not permitted to clock in more than five minutes prior to the start of their scheduled shift, but Geiger regularly worked 30 to 60 minutes prior to her scheduled shifts and stayed daily approximately thirty minutes after her shifts to complete work tasks.  (*Id*. ¶ 17.)  This additional time was over her scheduled forty hours a week, off the clock, and uncompensated.  (*Id*.)  Supervisors were aware of this additional time as they observed her sitting at her desk and working off the clock.  (*Id*.)

### E.    Plaintiff Lindsay Kallenbach

Kallenbach was an Admissions Representative for Regency from May 2010 through April or May 2011.  (Madia Aff. I ¶ 2, Ex. 3 ¶ 1.)  Through December 2010, Kallenbach worked roughly 45 to 50 hours per week for Regency.  (*Id*. ¶ 8.)  From May 2010 through December 2010, Kallenbach was paid on a salary basis.  (Am. Compl. ¶ 45.)  During this time, Kallenbach was routinely encouraged and sometimes required to

work through meal and rest breaks.  (*Id*.)  She regularly worked overtime hours.  (*Id*.)

Kallenbach felt strongly pressured to meet admissions goals and enroll more students.

(Madia Aff. I ¶ 2, Ex. 3 ¶ 10.)  Her supervisors knew she was working uncompensated

overtime because they saw her, encouraged and sometimes required her to do so.  (*Id*.)

Kallenbach was similarly told that she was and always had been an hourly employee.

(Am. Compl. ¶ 45.)

After the implementation of the time clock system, Kallenbach would regularly

arrive 45 minutes early for her scheduled shifts.  (Madia Aff. I ¶ 2, Ex. 3 ¶ 12.)

Kallenbach was observed by her supervisor, Tonna Jackson, working at her computer,

dropping off her reports, and then clocking in.  (*Id*.)  At the end of her shifts, Kallenbach

would regularly clock out, so as not to be reprimanded, and then continue to work on

tasks for Regency and make phone calls.  (*Id*. ¶ 13.)  Ms. Jackson saw her making phone

calls off the clock and said:  "I don't see you working and don't tell me about it, either.

But good job for getting out of the grey."  (*Id*.)  An employee being "in the grey" meant

that he/she had not reached and spoken to a certain percentage of prospective students

that day.  (Am. Compl. ¶ 47.)  Kallenbach worked roughly two hours per week off the

clock after her shifts ended.  (Madia Aff. I ¶ 2, Ex. 3 ¶ 13.)  On one occasion, Jackson

spoke to Kallenbach about clocking nearly 35 minutes of overtime in one week, from

clocking in five minutes before and after her scheduled shifts.  (*Id*. at 14.)  Jackson asked

Kallenbach why she could not finish her work during her shift like she had before, and

Kallenbach explained that she had been taking work home and working unpaid two to four hours per day.  (*Id*.)  Jackson responded:  "Figure it out."  (*Id*.)

## II.     Regency's Policies and Plaintiffs' Compensation

Prior to the implementation of the time clock system in December 2010, Plaintiffs assert that, because they were treated as salaried employees, Regency did not maintain a record of actual hours worked (including time before and after scheduled shifts).  (*Id*. ¶¶ 18-19.)  To their knowledge, no Plaintiff was aware of any tracking system used to record the hours they worked.  (Madia Aff. I ¶ 2, Exs. 1 ¶ 10; 2 ¶ 12; 3 ¶ 9; 4 ¶ 11 & 5 ¶ 12.)  Following the implementation of the time clock system, Plaintiffs and other similarly situated individuals were not permitted by Regency to clock in more than five minutes prior to a scheduled shift or five minutes after a scheduled shift.  (*Id*. ¶¶ 53, 58 & 64.)  As such, Plaintiff asserts that Regency did not maintain an accurate record of actual hours worked by Plaintiffs and other similarly situated individuals.  (*Id*. ¶ 19.)

The Regency Beauty Institute Employee Handbook, Effective November 3, 2010, includes the following language:

- You are expected to "clock in" no later than your scheduled start time.  You may, however, clock in up to 5 minutes prior to your start time.
- You may not "clock out" prior to your scheduled end time.  You may, however, clock out up to 5 minutes after your scheduled end time. . . .
- These 5-minute grace periods allow for flexibility in clocking in prior to your start time and after your end time only.
- There is no grace period to allow for late arrivals or early departures.
- You may not work outside of the grace periods in the absence of (1) a manager request to do so, or (2) an emergency.  What constitutes an emergency will be at the discretion of Regency.
  . . .

- From time to time, you may be assigned by a manager to perform work beginning prior to or after you scheduled shift and grace periods. When assigned, such off-schedule time is authorized. When you clock in or out for that day, you may be prompted by the system to click a reason for the schedule deviation, in this case, click "Supervisor Request."
- On any given day, if you think that off-schedule work is necessary or would be helpful, it is nevertheless required that you discuss the matter with a manager in order to determine whether he or she agrees that the extra time is necessary. In the absence of an actual manager request, you are not authorized to perform off-schedule work.
   . . .
- Hourly Employees are asked not to spend "down time" in their Regency facility outside of working hours, except as necessary due to transportation logistics and the like. When employees have a need to be in the workplace during non-working time, we ask that they are careful that their activities do not distract employees who are working and that in conformance with our policies, they do not themselves engage, in work.

(Carlson Decl. ¶ 11, Ex. 2 at 24-25.)

Regency's Employee Handbook further explains:

It is our expectation that Hourly Employees will be able, absent extraordinary circumstances, to manage their workload and successfully perform their job duties within their scheduled work hours. Any Hourly employee who is experiencing difficulty meeting this expectation should meet with his or her manager to request coaching and direction about how to use the scheduled time effectively and efficiently.

At the same time, from time to time, a Regency manager may request or require that one or more Hourly Employees work in excess of 40 hours in one or more workweeks. Such requests and requirements lie within Regency's discretion, to make as it determines to be necessary to provide consistent service to our students and to meet operational needs. Hourly Employees are expected to accommodate reasonable requests for additional work time.

. . .

In those circumstances in which an Hourly Employee works more than 40 hours in the workweek for any reason, that Employee will be paid "overtime" for the time worked in excess of the 40 hours.

. . .

Hourly Employees are required to report all time worked, by using the Employee Time Clock on the Regency System to create a "Daily Time Record." This rule helps us to ensure that:

- Hourly employees are paid for all time worked;

. . .

In each case in which an Hourly Employee forgets or otherwise fails to use the Employee Time Clock to record time worked in real time, he or she is required to submit a Time Entry Request.

. . .

From time to time an Hourly Employee's Daily Time Record will not accurately represent his or her working time for the day.

. . .

As an Hourly Employee, when there is an error or omission in your Daily Time Record for a particular calendar day, it is your responsibility to enter a Time Entry Request through the Regency system, with one exception: As set forth below, time entries required in connection with travel time will be submitted by the Human Resources Department following consultation with the employee.

. . .

Time Entry Requests are intended to ensure that Hourly Employees are able to add any compensable time that is missing from a Daily Time Record for any reason, to ensure that all wages due are paid. . . .

(Carlson Decl. ¶ 11, Ex. 2 at 22-30; *see also* Carlson Decl. ¶ 10, Ex. 1 (Employee Handbook, effective July 30, 2012).) The Regency document "FAQs for Hourly Employees" clarifies its policy regarding working remotely:

> If you are an hourly employee you are not permitted to work outside of
> your workplace unless your manager has authorized you to do so. Most
> hourly employees are not permitted to work remotely. This includes
> making phone calls for work, and reading or sending email from your
> Regency account (if you have one) and any other work for the company.

(Carlson Decl. ¶ 18, Ex. 9 at 3.)

According to Regency's records, between February 2010 and December 2010, several Plaintiffs reported overtime hours and were paid overtime compensation: Geiger reported and was paid for eighteen hours of overtime; Thunstrom and Widmer each reported and were paid for eight overtime hours; and Le reported and was paid for five overtime hours. (Doc. No. 25, Ackerman Decl. ¶¶ 5-6.) After the implementation of the time clock on December 20, 2010, each Plaintiff was paid for overtime hours according to the record from the time clocks. (*Id.* ¶ 7.) After December 20, 2010, Le reported and was compensated for 4.36 hours of overtime, Geiger reported and was compensated for 35.06 hours of overtime, Kallenbach reported and was compensated for 14.23 hours of overtime, Thunstrom reported and was compensated for 22.00 hours of overtime, and Widmer reported and was compensated for 10.30 hours of overtime. (*Id*.)

Plaintiffs' Amended Complaint asserts claims under the following statutes:

(1) Fair Labor Standards Act (Overtime and Record-Keeping Violations); and

(2) Minnesota Fair Labor Standards Act (Overtime, Rest and Meal Breaks, and Record-Keeping Violations). (Am. Compl. ¶¶ 82-98.) Defendants now move for partial

dismissal, and Plaintiffs move for conditional certification of this case as a collective action.

## DISCUSSION

### I.     Defendants' Motion

Defendants have moved for dismissal of both counts of the Amended Complaint insofar as they allege record-keeping violations.[2] Defendants also seek dismissal of Defendant Batson as a party to this action.

### A.     Legal Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

---

[2]     To the extent Defendants' original motion pertained to minimum wage claims, the motion appears to be moot, as Plaintiffs withdrew all such claims upon filing their Amended Complaint. (*See generally* Am. Compl.; *see also* Doc. No. 37 at 4-5.)

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the United States Supreme Court recently reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## B.     Partial Dismissal

### 1.     Claims Against Batson

Defendants maintain that Plaintiffs' claims against Batson must be dismissed. In particular, Defendants assert that Plaintiffs have not sufficiently alleged facts to establish individual employer liability under the FLSA and MFLSA.

The FSLA defines "employee" as "any individual employed by the employer." 29 U.S.C. § 203(d). An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Because the FLSA defines employer in such broad terms, it offers little guidance on whether a given individual is or is not an employer. In answering that question, the overarching concern is whether the alleged employer possessed the power to control the workers in question,

with an eye to the "economic reality" presented by the facts of each case. *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 33 (1961); *see also Saunders v. Ace Mortg. Funding, Inc.*, Civ. No. 05-1437, 2007 WL 4165294 at *4 (D. Minn. Nov. 16, 2007).

The factors in this economic realities test, although not exhaustive, include: (1) the degree of control over the manner in which the work is performed; (2) the worker's opportunity for profit or loss depending on his managerial skill; (3) the worker's investment in equipment or materials, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree or permanence of the working relationship; and (6) whether the service rendered is an integral part of the employer's business. *Donovan v. DialAmerica,* 757 F.2d 1376, 1382 (3d Cir. 1985) (quoting *Donovan v. Sureway Cleaners,* 656 F.2d 1368 (9th Cir. 1981)). The economic realities test is not mechanical or formal in its application. Instead, "it is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer." *Baystate Alternative Staffing, Inc. v. Herman,* 163 F.3d 668, 675 (1st Cir.1998); *see also Catani v. Chiodi*, 2001 WL 920025, at *3 (D. Minn. Aug. 13, 2001). "The same test is used to determine the existence of an employment relationship under the [MFLSA]." *McDonald v. JP Mktg. Assoc., LLC*, Civ. No. 06-4328, 2007 WL 1114159, at *13 n.4 (D. Minn. Apr. 13, 2007).

The Amended Complaint contains several allegations with respect to the degree of control exercised by Baston as well as his involvement in the supervision and operation of Regency as its sole owner, CEO, and Chairman. (Am. Compl. ¶¶ 67-70.) As such,

Plaintiffs claim that Batson is actively involved in the affairs of the company and its recruitment efforts and meets regularly with supervisory staff. (*Id.*) Plaintiffs further allege that Batson exercises "significant, if not total control over Regency's financial affairs and compensation practices" and that he has regular contact with Representatives. (*Id.*)

The Court concludes that, at this early stage, Plaintiffs' Amended Complaint contains sufficient allegations with respect to Batson to support viable claims against him pursuant to the FLSA and MFLSA.

## 2. Record-Keeping Claims

Defendants also contend that Plaintiffs' record-keeping claims must be dismissed. Plaintiffs concede that the FLSA does not give rise to a private cause of action for a violation of its record-keeping provisions. (Doc. No. 37 at 6.) Therefore, to the extent Count I asserts a record-keeping claim under the FLSA, Count I is properly dismissed.[3]

To the extent Count II of Plaintiffs' Amended Complaint asserts a record-keeping claim under the MFLSA, the Court concludes that Count II must also be dismissed. Minnesota Statute Section 177.30 requires employers to make and keep records that include "the hours worked each day and each workweek by the employee." Minn. Stat. § 177.30, subd. 3. "By definition 'hours worked each day' includes beginning and ending time of work each day, which shall include a.m. and p.m. designations, and such

---

[3]     Any evidentiary issues for trial that may arise from the dismissal of this claim will be resolved by the Court at a later date if and when the parties submit any relevant

(Footnote Continued on Next Page)

designations shall be included in the employer's records."  Minn. Admin. R. 5200.0100.

"[A]n employee may bring a private suit for the violation of *any* section of the MFLSA,

including a failure to maintain records."  *See Milner v. Farmers Ins. Exch.,* 748 N.W.2d

608, 618-19 (Minn. 2008) (citing Minn. Stat. § 177.27, subd. 8).

Plaintiffs rely on *Milner* to support their position that they can assert a

record-keeping claim under the MFLSA.  But Plaintiffs must first sufficiently plead such

a claim, which, like the plaintiffs in *LePage*, they have not done.  *See LePage v. Blue*

*Cross & Blue Shield of Minn.*, Civ. No. 08-584, 2008 WL 2570815 at *5 (D. Minn.

June 25, 2008).  While Plaintiffs claim that Defendants "engaged in a concerted effort to

purposefully prevent them from accurately recording their hours worked" by prohibiting

them "from clocking in or out more than 5 minutes prior to or after a scheduled shift"

(beginning in December 2010), such allegations do not rise to the level required to state a

valid claim under the MFLSA.  The Court adopts the following analysis from *LePage*,

which is directly on point:

> In *Milner,* the defendants admitted that they did not keep any time records
> pursuant to the Minnesota FLSA. *See* 748 N.W.2d at 610, 618.  That is not
> the case here.  But more importantly, Plaintiffs have not alleged that
> [Defendant] failed to keep any time records or that such records were
> inaccurate based on the time cards Plaintiffs submitted to [Defendant].
> Rather, Plaintiffs have alleged that [Defendant] failed to maintain records
> for certain time before and after their scheduled shift.  In other words,
> Plaintiffs are claiming that [Defendant] should have maintained records for
> this off-the-clock time even though they never reported it on their time
> cards.  The Court fails to understand how this translates into a

(Footnote Continued From Previous Page)
motions *in limine*.

> record-keeping violation.  In the end, Plaintiffs are attempting to take their
> substantive claim that they were not paid overtime, and bootstrap a
> record-keeping violation into their Complaint.

*Id.*  To the extent Plaintiffs' claim may arise from the period from February 2010 through

December 2010 (before the implementation of the time clock), the same reasoning

applies.  Plaintiffs reported and were compensated for overtime hours during that time

period.  (*See* Ackerman Decl. ¶¶ 5-6.)  Any dispute regarding their compensation does

not stem from a lack of records, which Regency has clearly maintained (and now

references) throughout all time periods in question, regardless of its overtime policies.

(*See id.*  ¶¶ 2-7.)  As such, the Court dismisses Count II insofar as it alleges a

record-keeping violation under the MFLSA.

## II.     Plaintiffs' Motion

Plaintiffs now move for Conditional Class Certification, Court Authorized Notice

and tolling of the statute of limitations.

### A.      Conditional Class Certification

The FLSA authorizes similarly situated employees to bring collective actions

against their employer if certain criteria are satisfied.  *See* 29 U.S.C. § 216(b).

Specifically, the statute provides:  "An action . . . may be maintained against any

employer . . . in any Federal or State court of competent jurisdiction by any one or more

employees for and in behalf of himself or themselves and other employees similarly

situated."  29 U.S.C. § 216(b).  Unlike a Rule 23 class action, however, no employee

shall be a party to a FLSA collective action unless "he gives his consent in writing to

become such a party and such consent is filed in the court in which such action is brought." *Id.*; *see, e.g., Smith v. Heartland Auto. Servs., Inc.,* 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005). Courts have discretion, in "appropriate cases," to facilitate the opt-in process by conditionally certifying a class and authorizing court-supervised notice to potential opt-in plaintiffs. *Saleen v. Waste Mgmt., Inc.,* 649 F. Supp. 2d 937, 939 (D. Minn. 2009) (quoting *Hoffman–La Roche Inc. v. Sperling,* 493 U.S. 165, 169 (1989)).

A court must perform a two-step process to determine whether a case should be certified under the FLSA:

> First, the Court determines whether the class should be conditionally certified for notification and discovery purposes. At this stage, plaintiffs need only establish a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan. In the second stage, which occurs after discovery is completed, the court conducts an inquiry into several factors, including the extent and consequences of disparate factual and employment settings of the individual plaintiffs, the various defenses available to the defendant that appear to be individual to each plaintiff, and other fairness and procedural considerations.

*Dege v. Hutchinson Tech., Inc.,* Civil No. 06–3754, 2007 WL 586787, at *1 (D. Minn. Feb. 22, 2007) (citations omitted); *see also Burch v. Qwest Commc'ns Int'l, Inc.,* 500 F. Supp. 2d 1811, 1186 (D. Minn. 2007).

Here, there appears to be no dispute that this case is at the first stage of the two-step inquiry. Thus, the Court must determine only whether Plaintiffs have come forward with evidence establishing a colorable basis that the putative class members are the victims of a single decision, policy, or plan. *Frank v. Gold'n Plump Poultry, Inc.,* Civil No. 04–1018, 2005 WL 2240336, at *2 (D. Minn. Sept. 14, 2005). The Court need

not make any credibility determinations or findings of fact with respect to contrary evidence presented by the parties at this initial stage. *Id.* at *3, n.2; *Brennan v. Qwest Commc'ns Int'l, Inc.,* No. 07–2024, 2008 WL 819773, at *3 (D. Minn. Mar. 25, 2008). "Determination of class status at the notice stage is granted liberally because the court has minimal evidence for analyzing the class." *Jennings v. Cellco P'ship*, Civ. No. 12-293, 2012 WL 2568146, at *3 (D. Minn. July 2, 2012).

Plaintiffs assert that members of the proposed class are similarly situated because Representatives, all of whom performed the same or similar job duties at the same location, were each subjected to Regency's unwritten policy requiring that they perform work before and after their scheduled shifts without compensation for their time.

The Court finds that Plaintiffs have met their burden for purposes of conditional class certification and notice at this initial stage of the proceedings. The certification standard at this initial stage is low. Considering Plaintiffs' minimal burden at this stage of the proceedings, the Court finds that this evidence is sufficient to establish a colorable basis for Plaintiffs' claims.

The class here is limited to one location where all Representatives used the same time-keeping and phone systems, have common oversight, and were compensated in the same manner. According to Plaintiffs, Defendants were aware of the failure to compensate Representatives because supervisors regularly witnessed Plaintiffs and others performing unpaid tasks. Moreover, the mere fact that Regency has a written policy requiring employees to record their time does not defeat Plaintiffs' motion in light of

Plaintiffs' assertions that supervisors systematically instructed Representatives to not report time worked. Moreover, "[t]hat the class here is limited to a relatively small number of employees at a single location bolsters Plaintiffs' claim that they were victims of a common policy or plan." *Jennings*, 2012 WL 2568146, at *5. At this initial stage, conditional certification is appropriate. *See, e.g., id.* (determining that plaintiffs in one call center provided "a colorable basis to conclude that Defendant has a common practice of failing to pay its Representatives for time before and after their shifts") (citing *McCray v. Cellco P'ship,* Civ. No. 10-2821, 2011 WL 2893061, at *2 (N.D. Ga. Apr. 8, 2011)); *see also Lyons v. Ameriprise Fin., Inc.,* Civ. No. 10–503, 2010 WL 3733565, at *5 (D. Minn. Sept. 20, 2010) (granting conditional class certification where allegations included failure to pay for time spent logging into and out of computers at one call center); *Burch,* 500 F. Supp. 2d at 1188 (granting conditional certification where call center employees were required to perform unpaid work before and after shifts).

Defendants' arguments concerning the individualized inquiries required and the merits of Plaintiffs' claims are inappropriate at this stage of the litigation. Such arguments may be raised at the decertification stage. *See Jennings*, 2012 WL 2568146, at *6. The Court concludes that Plaintiffs have satisfied their burden of demonstrating that they are similarly situated for purposes of conditional class certification.

**B.     Judicial Notice**

"[D]istrict courts have discretion, in appropriate cases, to implement 29 U.S.C.

§ 216(b) . . . by facilitating notice to potential plaintiffs." *Hoffmann–La Roche Inc. v.*

*Sperling,* 493 U.S. 165, 169 (1989).  "Because trial court involvement in the notice

process is inevitable in cases with numerous plaintiffs where written consent is required

by statute, it lies within the discretion of a district court to begin its involvement early, at

the point of the initial notice, rather than at some later time." *Id.* at 171.  The Supreme

Court has explained:

> By monitoring preparation and distribution of the notice, a court can ensure
> that it is timely, accurate, and informative.  Both the parties and the court
> benefit from settling disputes about the content of the notice before it is
> distributed. This procedure may avoid the need to cancel consents obtained
> in an improper manner.

*Id.* at 172.  "Court authorization of notice serves the legitimate goal of avoiding a

multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the

action." *Id.*

The Court exercises its discretion to facilitate notice in this case.  Court-facilitated

notice will help to prevent the expiration of claims based on the running of the statute of

limitations.  Judicial notice will also promote judicial economy by minimizing the

proliferation of individual lawsuits and is further appropriate based on the size of the

putative class.

The Court approves the proposed Judicial Notice provided by Plaintiffs with the

following changes.  (*See* Madia Aff. I ¶ 2, Ex. 23.)  The Court declines Plaintiffs' request

for a 180-day notice period and concludes that a 90-day opt-in period is sufficient. As such, the Court declines to further toll the applicable limitation period as requested by Plaintiffs.

Plaintiffs' counsel may send the Judicial Notice to putative class members by mail. Regency shall also be required to post the Judicial Notice in all break and lunch rooms at its Saint Louis Park headquarters. Plaintiffs' counsel may send one reminder letter during this 90-day notice period[4] with the following language added to Plaintiffs' proposed letter (Madia Aff. I ¶ 2, Ex. 24): "This Notice Serves to Notify You of This Pending Lawsuit. The Court Does Not Encourage or Discourage Participation In This Case." *See Jennings*, 2012 WL 2568146, at *6.

Within ten (10) days of the date of this order, Regency shall also provide Plaintiffs with a complete, electronic list of the names and last known addresses for all Representatives employed at Regency from July 2010 to the present.[5]

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

---

[4]     The Court declines to permit Plaintiffs to send two reminders as requested.

[5]     The Court declines to order Defendants to produce the additional information requested by Plaintiffs at this point in the proceedings. Any discovery-related issues concerning potential plaintiffs are premature at this juncture.

1.     Defendants' Motion for Partial Dismissal of Plaintiffs' Class and Collective First Amended Complaint (Doc. No. [44]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.     To the extent Defendants seek dismissal of Count I of Plaintiffs' Amended Complaint insofar as it asserts a record-keeping claim under the FLSA, the motion is **GRANTED**.

    b.     To the extent Defendants seek dismissal of Count II of Plaintiffs' Amended Complaint insofar as it asserts a record-keeping claim under the MFLSA, the motion is **GRANTED**.

    c.     In all other respects, the motion is **DENIED**.

2.     Plaintiffs' Motion for Class Certification, Court Authorized Notice, and Tolling of Statute of Limitations (Doc. No. [14]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.     To the extent Plaintiffs seek conditional class certification, the motion is **GRANTED**.

    b.     To the extent Plaintiffs seek judicial notice, the motion is **GRANTED IN PART** and **DENIED IN PART** as set forth in detail above.

c.	To the extent Plaintiffs seek to toll the statute of limitations,

the motion is **DENIED**.


Dated:  July 15, 2013			s/Donovan W. Frank
						DONOVAN W. FRANK
						United States District Judge